319-0007, Thomas Dunn, appellant by Michael Leonard, versus Centerpoint Properties Trust and Michael Mullen, appellees, by Scott Poster. Before we begin, I'm just trying to connect you here. So, you're going to listen to the tapes of our discussion here. And participate fully in the case. And because this is such a fact-intensive inquiry, I would like to highlight some of the germane facts. I mean, we've had the benefit of our briefs, so I won't regurgitate that. But I will highlight certain things. First of all, the terms of the initial agreement between Mr. Dunn and Centerpoint were hatched at a meeting between Mr. Dunn and Mr. Mullen, who was the CEO of Centerpoint. They had a verbal discussion. And then, according to Mr. Mullen, he put a very basic and sort of vague proposal of an agreement together by way of email, which Mr. Dunn accepted. That agreement generically said that Mr. Dunn was going to provide political advice. However, it's undisputed from Mr. Mullen, from Mr. Dunn, and from Mr. Terrell, who was the chief lobbyist on this matter for Centerpoint, that the entire purpose of this initial agreement was for Mr. Dunn to do nothing other than to attempt to get a tip from the City of Joliet. That was it. And I could cite you to Mr. Mullen's own testimony, which is in the record at page 473, where he states specifically that the purpose of that initial agreement, I wanted Dunn to help us get a tip. That's what I was looking for Mr. Dunn to do. Did he get a tip from him? He did not. Then why are we here? Because what happened, Your Honor, is, as you probably know from the record, we fast forward to April, which at that point it's undisputed that Centerpoint abandoned, in their own terminology, according to Mr. Mullen and Mr. Terrell, their efforts to get a tip. But the story doesn't end there, Judge, as we know, because what happens at that point is the parties have another meeting, and during this meeting they agree that Mr. Dunn is going to help them pursue an entirely different subject matter, which we refer to in the claim as the Dunn 3% proposal, but it's the idea hatched by Mr. Dunn, pursuant to which they would attempt to get the Illinois legislature to draft legislation to set aside money from the employees who work on the project that would go into a fund, and then Centerpoint would get 3% of that. Entirely different than this tip. So everyone agrees the tip, which had been the subject matter of the original agreement, that's abandoned. The parties agree to continue to perform under a modified oral agreement going forward for April, and that's exactly what they do, Your Honor. And we know that because all parties agree that's what's happened. In fact, Mr. Dunn, what he does is work closely with Mr. Terrell, who is the chief lobbyist, and comes up with a strategy that he gives Mr. Terrell to bring to the people who draft legislation in the Illinois legislature. And Mr. Dunn advises Mr. Terrell on the language of that bill. Things come up from time to time, issues. There is a dispute between two senators at one point about the substance of the bill. Mr. Terrell comes back and seeks Mr. Dunn's input in how it should be resolved. Mr. Dunn provides advice and counsel on that subject, and that is much prior to the bill being passed. And Mr. Dunn testifies that he continued to advise Terrell on things as when to introduce the bill, the appropriate sponsors, and things of that nature. We also know from record- Did he get paid $10,000 a month? He did. That's not what we're seeking. So in this case we're seeking- Yeah. There was two components of the original agreement, which is our contention, continued into the modified agreement, which was the $10,000 per month, which it's undisputed he was paid that. But the success fee, he was not paid. And that's what we're seeking to recover in this case. Because we believe that the modified agreement that they hatched in April of 2018, by their words and by their conduct, and continuing throughout- I'm sorry, 2008. And continuing throughout 2008 into early 2009, by their words and conduct, they agreed that this is what Mr. Dunn was going to do for them. He was going to help them pursue the 3% proposal. And it's our position that the modified agreement included the success fee. And that's, according to the case law, a question of fact, because parties can acquiesce to the modification through a course of conduct or words that are consistent with acceptance. So obviously, the entire time, Mullen, the CEO, Terrell, the chief lobbyist, they all agreed that the new marching orders for Mr. Dunn, which had been the TIF, were going to be this modified agreement pursuant to which they would pursue the Dunn 3% proposal. And it's undisputed that Mr. Dunn performs work and services all the way into- there's record testimony of him performing services in November of 2008 and all the way until January of 2009. We don't dispute that he got the $10,000 payments. But we do, of course, dispute that he didn't get the success fee. And if we call back to the original language of this first subject matter of the TIF agreement, was that they will pay him a success fee. So Mr. Dunn, in continuing to perform under the modified agreement, reasonably believed that he would get the success fee that they said shall be paid to him or will be paid to him. And we know from Mr. Mullen's own testimony, Mr. Mullen's own testimony creates a genuine issue of material fact because they have a conversation, Mr. Mullen and Mr. Dunn, about the success fee, and that's in September of 2009. And at that time, contrary to his self-serving deposition testimony, at that time Mr. Mullen does not take the position with Mr. Dunn, hey, Tom, you know, the success fee, which we had part and parcel of the original agreement, it wasn't part of the modified agreement. You know, we took the success fee out. You're not entitled to the success fee. He doesn't take that position. Instead, he takes the position that at that point in time, I just wouldn't recommend a success fee to you, Mr. Dunn, because we worked hard on this. That was his position. So it's an admission or at least creates a question of fact as to whether the success fee was part of the modified agreement. What were they paying him $10,000 for? To do, to provide the services in connection with the Dunn 3% proposal. Just like under the original, to provide services in connection with Dunn's 3% proposal, which is entirely different than the efforts with regard to the TIF, which we know ceased in April of 2008. So we get to this conversation, this seminal conversation with Dunn and Mullen. At a minimum, that creates a genuine issue of material fact as to whether the success fee was carried over to the modified agreement. That's a question of fact for the jury to decide in this case. Well, let me ask you this. Is it also your position that it's a question of fact whether your client was an employee? Well, Judge, there's certainly an inference that it could be. And what I would cite you to on that is that Mr. Mullen testified, as you probably saw in the appellee's brief, they tried to take the position that, hey, you know, nobody here was attempting to direct or control Mr. Dunn. That's where Mr. Mullen took the position. And in fact, though, Mr. Terrell, who actually was this hands-on guy with respect to Mr. Dunn, testified, and I'll cite you to his deposition that's page 35, which is in the record at page 498. Terrell testifies that Mullen told him specifically that he was to provide the direction and control over Dunn. So we have the person who's most hands-on telling us that Mullen told him to direct and control the efforts of Dunn, which is directly contrary to the testimony of Mullen. And if you remember, Your Honors, Mr. Mullen admitted in his deposition that he lied. Mr. Mullen, one of the seminal issues was where did this 3 percent proposal come from? Well, Mr. Mullen sends Mr. Dunn a specific e-mail saying in June of 2008, after the legislation was passed, congratulations, Tom, this all started with you, this all came from you, meaning the 3 percent proposal. Then he comes to his deposition and admits that he was lying. So these are genuine issues of material fact as to who had control and who had direction. If Mullen was found to be lying about a material fact in one instance, the jury could draw a credibility determination with regard to other material issues of the contract. I'd like to address a couple additional issues. One of the arguments that the appellee makes is that Mr. Dunn's actions did not confer any benefit upon Centerpoint because Mr. Dunn didn't pass the legislation. Mr. Dunn didn't pay the money from the state to Centerpoint. Well, that defies logic. Let's start with if they had been a TIF. If Mr. Dunn had achieved a TIF under the original agreement, they wouldn't be arguing to you that, well, Mr. Dunn's not entitled to a success fee because the city of Joliet is the one that provided the TIF and money, not Mr. Dunn. And also we know from common sense in every case someone provides services to another. For instance, you might spend hours or hundreds of hours developing a client, bringing them in, and securing a deal. Now, no one would argue under those circumstances that, well, hey, the client's paying the money to the company despite the fact that the employee or agent or consultant worked hundreds of hours or dozens of hours. There's no benefit brought to the company by the efforts of this guy because the third party's paying. That just defies logic. There's another issue raised, which I'd like to address, which goes to the issue of damages. And they take the position, if you'll believe, that there are no damages or that Mr. Dunn can't testify to what the damages are. Mr. Dunn doesn't have to be the person testifying to damages. We have undisputed testimony from two people. Mr. Mullen testified that the benefit to CenterPoint from this was between $700,000 and $800,000. And that's in the brief. I could also cite you to Mr. Terrell's testimony, which is not in the brief, but is in the record at page C513. And he tells us that the benefit to CenterPoint was actually $1.1 to $1.2 million. So the other issue is they say, well, Mr. Dunn can't produce, can't, shouldn't be allowed to provide any evidence of damages. Well, we know he can produce the testimony of Mullen and Terrell as adverse witnesses. But he also answered an interrogatory, which now, on summary judgment and on appeal, they take umbrage with. And in the interrogatory, which is part of the record at C543, interrogatory number 9, Mr. Dunn does indicate with some specificity what his damages are. There was no issue raised with respect to his answer ever until summary judgment. At summary judgment, he said, hey, he's got an interrogatory answer on damages, but we find it to be insufficient. We don't think it gives us enough facts. Well, you could have raised it, you had an obligation to raise it before the trial court prior to summary judgment if you thought his interrogatory response lacked specificity. It's not the time on summary judgment to say there's no genuine issue of material fact because we don't like your interrogatory response. So for all of those reasons, we would ask you to find that genuine issues of material fact remain with regard to its success because we clearly have a modified agreement after April 2008 whereby the parties agreed Mr. Dunn would pursue the 3 percent proposal. The TIF was abandoned. It was off the table. This was a new subject matter, a new agreement. We don't contend he wasn't paid the $10,000. We contend he wasn't paid the success fee, that the success fee was part of the modified agreement, and part of the modified agreement means he shall get it. He shall get a bonus or success fee. And we have the – What size bonus? I'm just wondering. Yeah. This contract, who signs that contract? What's the difference? Isn't this contract basically a lawsuit waiting to happen? Oh, we'll pay you a success fee to be determined at a later date, give a percentage. You might be right. Mr. Mullen, who's the draftsman, who we have to draw the inference against, he's the one that drafted it. Mr. Dunn accepted it. But the key language is that they will pay him a success fee. Not that we might or not in our discretion, but we will pay you a success fee. That was Mr. Mullen's language that he chose, not Mr. Dunn's. So if Mr. Mullen set himself up for a lawsuit, so be it. But I think more important, Justice Schmitt, is we have Mr. Mullen's admission from the conversation with Dunn in September of 2009. At that point in time, Mr. Mullen is not taking the position that, hey, Tom, success fee's not part of this modified agreement. No. He says, I'm just not going to recommend a success fee contrary to the language, the modified language, the original language of the party's agreement. So for those reasons, these are questions of fact. These are questions of fact for the jury to decide. We would ask that you revert to trial court and find that summary judgment was entered improperly. Thank you. Thank you, Mr. Greiner. The jury's adjourned. Thank you. If it pleases the court and my opponents, Mr. Dunn, Mr. Leonard, my name is Scott Hoster, and I represent Centerpoint in this matter. The oral argument just presented by Mr. Leonard, I think, in my view, establishes all the more reason for the affirmation of the summary judgment entered by Judge Powers on the first three counts of this case, and then the subsequent summary judgment on count four, which is Quantum Merowick, which was entered by Judge Rossi. I'd like to just go with a little bit of procedural history here. This case was filed, count one, breach of contract, count two, Illinois Wage Payment and Collection Act, and count three, promissory estoppel. I took Mr. Dunn's deposition, and I believe Mr. Dunn is one of the most well-respected figures in Will County. He was a state senator. He was an associate judge. He was an outstanding attorney. No one doubts that as a state senator, he did tremendous work for Joliet and Will County. I took his deposition, and I got honest answers, which is what I would consider or expect from a man of Mr. Dunn's stature. I did not think there was going to be much of anything to this Illinois Wage Payment and Collection Act. I asked Mr. Dunn questions. The answers I got from him indicated he was a consultant. He came and went, and he pleased. He got $10,000 a month. They didn't withhold any taxes. Mr. Dunn, as a lawyer, doesn't have a license now, but state senator, judge, he knows what an employee is and what an independent contractor is. So I got the answers I wanted there, and I didn't think there was any question. He's not an employee, so a complaint. If he was entitled to money, he wouldn't be entitled to it under the Wage Act, and we don't think he's entitled to money anyway. I really honed in on breach of contract, which was count one of his complaint. And I asked him specifically because the contract said we would negotiate, and Justice Schmidt, you're exactly right. It's why they didn't have lawyers draft the contract. This was about a loosey-goosey e-mail that said if we get zoning annexation and a reasonable TIF, you and I will meet in the future and talk about a reasonable success fee or whatever it was. That is an accident waiting to happen. There is absolutely no question about that. But he was paid $10,000 a month to give political advice. The contract ran for a year. We know he didn't get the TIF because, actually, the city manager at that time was Tom Thanos, who was a retired Will County judge also, so we've got a lot of judges in this case. Mr. Thanos was the city manager. He was the post. He said the TIF was dead on arrival. There was never a way that the city of Joliet was going to grant a TIF. So that knocked out the success fee as part of the contract because they did get annexation, they got zoning, but they didn't get a TIF. Mr. Dunn was not going to be able, even with his abilities, was not going to be able to persuade the city of Joliet to give him a TIF, and they never did get a TIF. So I was honing in. Mr. Dunn, in paragraph 21 of his complaint of the lawsuit that he filed, it said that the contract was modified by words and actions from CenterPoint. I honed in on that at his deposition, and I believe, I apologize, my summary judgment statement of facts, you find it at C43, and it incorporates the pages of Mr. Dunn's deposition. But I asked Mr. Dunn at his deposition, how did CenterPoint modify the contract through their words and actions? And he said, that never happened. Those were the three words that he used, that never happened. I hammered on that in my summary judgment motion that there was no amendment of the contract because Mr. Dunn himself said there was never an amendment to the contract. And when I argued that, I argued as forcefully as I could before Judge Powers that Mr. Dunn admitted there was never an amendment to the contract. And Judge Powers accepted my argument and granted summary judgment on the first three counts of the complaint. There was another count standing for unjust enrichment that Judge Powers left standing. And then I got into, we got into that and started briefing that before Judge Rossi, and you read the transcripts of the oral arguments. Justice Litton wrote an opinion in 2009 called Martis, that unjust enrichment can't stand alone as a cause of action. And in fact, it was standing alone. So my oral argument, I said to the best of my knowledge, Justice Litton is alive and well, and I see that you're alive and well today. You wrote Martis in 2009, and it was never overturned. And so Judge Rossi dismissed unjust enrichment. So then Judge Rossi, over my objection, let them come up with quantum meriwet as a complaint. And so quantum meriwet, we briefed that, and I filed a motion for summary judgment. You can't have quantum meriwet if there's a contract. And so that's why the bulk of their appellate brief, in my view, dealt with quantum meriwet. And I didn't hear Mr. Leonard say anything about quantum meriwet at oral argument. I just heard him talk about an amendment to the contract, and those are totally different counts. It sounds like he's saying there's an issue of fact on count one, which was breach of contract. The contract was amended, but there is a contract. If that's the case, 203 would still go be thrown out, and then quantum meriwet, which is what we spent a lot of time on at the end, there is no quantum meriwet if there's a contract. So if that's where we're going to go on breach of contract, that takes us back to the same thing. We know they didn't get the TIF, so there's no success fee. Mr. Dunn said the contract was never modified by the actions of Centerpoint or Mr. Mullen, and I asked Mr. Dunn at his deposition, did anybody from Centerpoint ever tell you you were going to get paid for coming up with this 3% edge tax idea? And he said no, nobody from Centerpoint ever promised him that he was going to get paid for coming up with this idea. And this takes us back to our argument that Mr. Dunn is a smart man. He was a state senator. He was paid $10,000 a month to give political advice, and this is what he did. He knew the edge tax had been used in Illinois before. He came up with some ideas for the language. He said make sure it says shall so that the General Assembly can't take the money away from Centerpoint. Make sure it says shall. He offered advice and counsel to Centerpoint's lobbyists, but that's what he was paid $10,000 a month for. And Justice Schmitt, you just asked Mr. Leonard why was he paid the $10,000 a month, and I believe Mr. Leonard just said he was paid the $10,000 a month for the 3% agreement, which is what I thought. And then you asked him again, what did you just say? And so if he was paid $10,000 a month for giving political advice as a retired state senator, that's we're done. I mean, he was paid $120,000 over a one-year period, and he gave political advice. The edge tax was passed. It was signed by the governor, and so Centerpoint got approximately a million dollars of benefit from it. So, again, our position is Justice Schmitt asked right out of the box, you know, why are we here? They didn't get the TIF. That's our position. We didn't get the TIF. There is no success fee promised because of that, and there was no amendment to the contract where Mr. Dunn was ever promised he was going to get paid anything more for his idea that he had at the Drake Hotel in Oak Brook at a lunch meeting. He said, why don't you try to use the edge tax and use a 3% solution? And that was a good idea from Mr. Dunn. The edge tax has been used all over the state of Illinois, and Mr. Dunn is very knowledgeable about it. That's why he was paid $10,000 per month. So if they're going now under count one and asking for a reversal of summary judgment on count one, we don't believe there's any proof that the contract was ever modified. And it doesn't seem like they've touched quantum Merowith, which would mean there was no contract. So for those reasons, we ask that you affirm, I guess it's going to be Judge Powers on counts one, two, and three, if we're not going to argue about quantum Merowith, which was count four. So any questions either of you, sir? Thank you very much, Your Honors. Thank you, Mr. Asher. Mr. Dunn. Thank you. Very briefly, Your Honors, I do want to address one citation of the record that was made by counsel. Counsel indicated that Mr. Dunn testified that the contract was never modified. That's simply false. The citation that counsel gave was at page C96, which is page 28 of Dunn's deposition. The question that he was asked, I think, but was not whether the contract was ever modified, they said was there a very specific conversation after 2008 about the success fee. That's what he said, that never happened. But calling the Court's attention back to the issue at hand is the success fee. The cases we've cited in our brief, including the Maher case, the Janda case, and the Cox v. Road Savers case, state very clearly that whether a contract has been modified is a question of fact. And the terms, whether a particular term that was part of the prior agreement, whether that part becomes part of the modified agreement, is likewise a question of fact. And that's what the Court struggled with in the Cox case. They said the Court erred by correcting summary judgment because it's a question of fact as to which provisions went into the modified agreement. And we would argue that the issue is whether the success fee, whether that carried over to the modified agreement or not. And we say that two things support that it did. One, there was no statement to the contrary. Number two, Mr. Mullen, by at least implicit admission, took the position that Mr. Dunn, not that it wasn't part of our agreement going forward on the 3%, but I just decided you're not going to get one. I wouldn't recommend one for you. That was his position. So those create genuine issues of material fact as to whether the success fee went with the modified agreement or not. We think that's the issue for the Court to decide. And we appreciate your attention to this. Thank you. Thank you, Mr. Leonard. Thank you both for your arguments today. I present this matter under advisement to pass with a written disposition within a short date. I'm now taking a short recess for panel discussion.